**FOLLANSBEE METALS CO., INC.,**
a corporation, Plaintiff,

v.

**JOHN T. CLARK AND SON OF NEW HAMPSHIRE, INC., a corporation,**
Defendant.

**Civ. A. No. 74–285.**

United States District Court,
W. D. Pennsylvania.

Dec. 16, 1974.

Clyde Armstrong, Thorp, Reed & Armstrong, Pittsburgh, Pa., for plaintiff.

Norman Cowie, Thompson, Rhodes & Grigsby, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

SNYDER, District Judge.

The Defendant in this diversity contract action, a New Hampshire corporation, has filed a Motion to Quash Service and a Motion to Transfer Under 28 U.S.C. § 1404(a), asking transfer to the District of New Hampshire or to the District of Massachusetts. Both Motions will be denied.

Plaintiff, Follansbee Metals Co., Inc. (Follansbee), is an Illinois corporation with its principal place of business at McKees Rocks, Pennsylvania. Defendant, John T. Clark and Son of New Hampshire, Inc. (Clark), is a New Hampshire corporation with its principal place of business at Portsmouth, New Hampshire, and is a wholly owned subsidiary of John T. Clark and Son of Boston, Inc. Following some rather extensive negotiations, arrangements were completed for the shipment of steel sold by Follansbee to Stahl-Eisen-Maschinen (SEM) of Hamburg, Germany. The steel was to be shipped through Portsmouth, New Hampshire, where Clark was to act as the stevedoring company and provide marine terminal servicing. This action by Follansbee asserts that Clark, during its handling pursuant to the stevedoring contract, damaged the steel.

The records in this case contain Affidavits submitted by both parties in support of their respective positions, Plaintiff's Interrogatories which have been answered by the Defendant, Lists submitted by both parties of the contacts which the Defendant had with the Commonwealth of Pennsylvania, and a Stipulation entered into by the parties as to certain facts. From these we glean that in March of 1973, Follansbee contracted with International Metal Trading Co. of Madrid, Spain (IMT) to sell certain steel to IMT, f.o.b. Pittsburgh. IMT contracted with SEM to sell the steel to SEM, f. o. b. stowed on board a chartered vessel (the Arosia). IMT then contracted with Clark to provide the stevedoring and marine terminal services which were necessary to satisfy IMT's contract with SEM. It then developed, in late May of 1973, that IMT's contract with Follansbee was cancelled because of IMT's inability to honor a credit provision. Follansbee then contracted directly with SEM to sell the steel to SEM, f. o. b. stowed on board a chartered vessel, and Follansbee also contracted with Clark for the stevedoring and marine terminal services necessary to satisfy its contract with SEM.

The steel was shipped from Follansbee to Clark during the period May 8th through May 17th, 1973, and was unloaded from railway cars by Clark during the latter part of May and early part of June, 1973. The steel was stored by Clark in Portsmouth, New Hampshire from early June until July 24, 1973. From July 24th through July 26th, 1973, Clark's stevedores loaded the steel on board the Arosia. When the steel was delivered by the ocean carrier to the purchaser in Antwerp, Belgium, it was in a damaged condition and Follansbee was required to give SEM substantial credit for which Follansbee now claims damages in excess of Ten Thousand Dollars from Clark.

The first contact between the parties was a phone call from Timothy Keefe, President of Clark, to Arnold Nelson, President of Follansbee, and was made at the express direction of IMT. Subsequently, over the course of the next five months, Clark made some eighteen phone calls to Follansbee at McKees Rocks, Pennsylvania, and received sixty-two calls from Follansbee at McKees Rocks; Clark also sent two telegrams and nine letters to Follansbee. Three documents which have been presented concern themselves with finalizing and formulating the agreement between the parties: the letter of June 1, 1973 from Keefe to Nelson, the telegram of June 7, 1973 to Nelson from Keefe, and the telegram of July 19, 1973 to Keefe from Nelson.

The Defendant contends that it is engaged in the performance of marine

terminal and stevedoring services only at the port of Portsmouth, New Hampshire, and has not performed any services in any other jurisdiction, either before or after the period involved in this present litigation. It admits being wholly owned by John T. Clark and Son of Boston, Inc., and also being affiliated with another Clark corporation in Maryland. These corporations performed terminal and stevedoring services in Massachusetts and Maryland, respectively, and neither of these corporations have performed terminal or stevedoring operations within Pennsylvania. There was an affiliation with a John T. Clark and Son of Philadelphia, Inc., a New Jersey corporation, which has performed no work in Pennsylvania since 1968 and which is not presently an operating corporation.

By Affidavit, Clark set forth that prior to its contract with the Plaintiff herein, the Defendant did not perform any contract for any citizen or any corporation of the Commonwealth of Pennsylvania, nor did it have any business dealings with Pennsylvania citizens or corporations. Clark also set forth that the initial contact with Follansbee came at the direction of IMT, who requested Clark to contact Follansbee for shipping instructions. From this point on, Clark had no further contact with IMT, but dealt solely with Follansbee. On the initial telephone conversation of March 28, 1973, Clark gave Follansbee specific shipping quotes in accordance with the directions of IMT. Clark claims that when the first shipment arrived in Portsmouth about May 8, 1973, Arnold Nelson (of Follansbee) was notified of the damaged condition of the steel, and he came to Portsmouth, at which time it became apparent that IMT was no longer to be involved and that Follansbee would have to work out terms and conditions under which Clark would perform its services for Follansbee and on Follansbee's account. During subsequent telephone conversations there appeared to be some underlying misunderstanding, and as a result, a letter memo-randum of the terms, dated June 1, 1973, was sent to Arnold Nelson asking assent thereto in writing. The written assent was subsequently given and Follansbee sent a telegram to Clark on July 19, 1973, confirming the terms and conditions.

## I. MOTION TO QUASH SERVICE.

We are required to interpret the "Long-Arm" Statute of the Commonwealth of Pennsylvania, known as the Act of November 15, 1972, P.L. ——, No. 271, §§ 8301 et seq., effective February 13, 1973, 42 Pa. S. § 8301 et seq. (Supp. 1974).

As to foreign corporations, Pennsylvania's Legislature added the following pertinent provision (42 Pa. S. § 8309):

"(b) *Exercise of full constitutional power over foreign corporations.*— In addition to the provisions of subsection (a) of this section the jurisdiction and venue of courts of the Commonwealth shall extend to all foreign corporations and the powers exercised by them to the fullest extent allowed under the Constitution of the United States."

We need refer briefly only to the three landmark cases of International Shoe Co. v. Washington, 326 U.S. 310, 66 S. Ct. 154, 90 L.Ed. 95 (1945), McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), and Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), to understand the full import of modern due process standards for in personam jurisdiction.

*International Shoe* abandoned the "presence" theory in favor of a "minimum contacts" theory, for in the words of Mr. Justice Stone (326 U.S. at 316, 66 S.Ct. at 158):

". . . due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the main-

tenance of the suit does not offend 'traditional notions of fair play and substantial justice.' "

The policy behind the "minimum contacts" theory was explained by the Supreme Court in *McGee,* stating as follows (355 U.S. at 222–223, 78 S.Ct. at 201):

"Looking back over this long history of litigation a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents. In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity."

It is necessary to note that in *McGee,* a foreign insurance corporation sold and delivered a policy in California, the premiums were mailed from California and the insured was a resident of California when he died. The Texas insurance company that had assumed the obligations of an Arizona company, the original insurer, was held to have demonstrated the minimum contacts sufficient to satisfy due process because of the substantial connection of the contract with California.

In *Hanson,* the Court clarified the standard as applied in *International Shoe* and *McGee* by noting that a defendant must "purposefully [avail] itself of the privilege of conducting activities within the forum State" (357 U.S. at 253, 78 S.Ct. at 1240). In that case, a settlor of a trust became domiciled in Florida and the trustee, a foreign domiciliary, remitted trust income to the settlor to Florida. The Court pointed out that while the settlor performed various acts in Florida, the record disclosed no instances in which the trustee performed any such acts in Florida, and that, therefore, the unilateral activities of the plaintiff would not be sufficient to establish jurisdiction, if they were the only activities in the foreign state. The Court noted (357 U.S. at 252, 78 S.Ct. at 1239):

"Consequently, this suit cannot be said to be one to enforce an obligation that arose from a privilege the defendant exercised in Florida."

The Defendant in the instant case argues that on the basis of *Hanson* this Court did not acquire jurisdiction under the due process requirements, insisting that the various contacts by letter, telegram and telephone, made with the Pennsylvania corporation, were essentially at Follansbee's behest for the purpose of clarifying the terms under which the transaction was to be carried out in New Hampshire and to answer the many communications emanating from Pennsylvania. The Defendant then submits that under the law laid down in *Hanson,* the activity of the Plaintiff may not be considered by the Court in determining substantial contacts, any more than the four communications from Florida should be considered. (357 U.S. 252 n. 4, 78 S.Ct. 1228) However, we conceive this to be a misreading of *Hanson,* which only related to the unilateral activities of the settlor when the trustee had no activity within the forum state. In the case at bar though, the parties were involved in two-way communications and each communication, whether initiated solely by the Defendant or by the Plaintiff, was an act in the furtherance of a business relationship. We must consider all of these acts to determine whether the foreign corporation "purposefully avail[ed] itself of the privilege of conducting activities within the forum State". If those acts are the foreign corporation's only contacts within the forum state, then in order for the forum state to

have in personam jurisdiction over the foreign corporation, the cause of action must have arisen from those acts.

No discussion by this Court of in personam jurisdiction over foreign corporations would be complete without reference to Proctor & Schwartz, Inc. v. Cleveland Lumber Co., 228 Pa.Super. 12, 323 A.2d 11 (1974). There, after extensive negotiations in Georgia and by mail, as well as over the telephone, a contract was accepted by Proctor, a Pennsylvania corporation, under the terms of which Pennsylvania law was to apply and was to govern its interpretation. Proctor was to purchase and to have constructed lumber drying equipment and related materials. Cleveland, alleging certain defects in the manufacture and installation, refused to make further payment to Proctor. Proctor then instituted the action to recover the balance due on the purchase price and other related expenses, and service was made under the Pennsylvania "Long-Arm" Statute. Cleveland maintained no offices in Pennsylvania, had no interest in any real or personal property in Pennsylvania, had not acquired, with the exception of the subject transaction, any materials, supplies, financing or services from any business entity located in Pennsylvania, had no agents, representatives or employees in Pennsylvania, was not present in any way physically in Pennsylvania and, with the exception of the subject transaction, had no business contacts with Pennsylvania.

Referring to the same three cases which we have referred to hereinabove, the Court in *Proctor,* stated as follows (228 Pa.Super. 18–21, 323 A.2d 15):

> "These decisions provide only a framework under the broad formula of 'fair play and substantial justice' and a determination of whether or not the 'minimum contacts' of a foreign corporation with a particular state are sufficient to make the corporation constitutionally amenable to process in that state must inevitably be made

on an ad hoc case-by-case basis and not by the application of a mechanical rule. Campbell v. Triangle Corp., 336 F.Supp. 1002 (E.D.Pa.1972).

However, we can find certain guidelines which aid in the factual analysis necessary to make the determination of whether the requisite 'minimum contacts' are present in a given case. First, the defendant must have purposefully availed itself of the privilege of acting within the forum state thus invoking the benefits and protections of its laws. Hanson v. Denckla, *supra.* Secondly, the cause of action must arise from defendant's activities within the forum state. *See* Southern Mach. Co. v. Mohasco Indus., Inc., 401 F.2d 374 (6th Cir. 1968); Electric Regulator Corp. v. Sterling Extruder Corp., 280 F.Supp. 550 (D. Conn.1968). Lastly, the acts of the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over it reasonable. International Shoe Co. v. Washington, *supra; see* Southern Mach. Co. v. Mohasco Indus., Inc., *supra; see also* In-Flight Devices Corp. v. Van Dusen Air., Inc., 466 F.2d 220 (6th Cir. 1972); Kourkene v. American BBR, Inc., 313 F.2d 769 (9th Cir. 1963)."

This Court has no difficulty in finding that the first element relating to the purposeful doing of an act within the Commonwealth has been satisfied. The defendant voluntarily entered into a contract with a Pennsylvania corporation which contract was to be governed by Pennsylvania law. When obligations entered into by a foreign corporation have a realistic economic impact on the commerce of this Commonwealth and where the defendant should reasonably have foreseen that the transaction would have consequences in this Commonwealth the defendant has purposefully availed itself of the privilege of acting within the Commonwealth. *See* Southern Mach. Co. v. Mohasco Indus., Inc.,

*supra*; *cf.* Royce and Mason, Non-Resident Jurisdiction in Business Litigation, 53 Chi.B.R. 100 (1971).

The second analytical step requires only that the cause of action arise from the defendant's activities within the forum state. The mere fact that the defendant availed itself of the privilege of doing business in Pennsylvania will not support a cause of action which is unrelated to the defendant's activities in this state. We find in the instant case that the plaintiff's cause of action arose directly from the defendant's acts within this state. The activity which satisfies the 'purposefully availed' test above is the entering into contractual obligations. The cause of action arises from the breach of those same obligations. The entering into commercial obligations and the breach of those obligations in the forum state provides the necessary jurisdictional relationship.

A finding that the first two steps have been satisfied, however, cannot conclude the jurisdictional analysis. The most significant element yet remains: Will the exercise of jurisdiction in this particular case be fair and reasonable under the circumstances? The conclusion of this issue necessarily involves a consideration of the interests of the Commonwealth in this action. It cannot be disputed that this Commonwealth has an interest in resolving a suit brought by one of its residents. Aquarium Pharmaceuticals, Inc. v. Industrial Pressing & Packaging, Inc., *supra* [358 F.Supp. 441]; Lebowitz v. Forbes Leasing & Fin. Corp., 326 F.Supp. 1335 (E.D.Pa.1971), cert. denied, 409 U.S. 843 [93 S.Ct. 42, 34 L.Ed.2d 82] (1972); *see* Thompson v. Ecological Science Corp., 421 F.2d 467 (8th Cir. 1970). Additionally, Cleveland entered into a contract which called for substantial production of goods in this state and which involved substantial commerce within this state. However, jurisdiction cannot be based solely on a quantitative economic impact combined with a substantial interest, for due process requires that the exercise of jurisdiction be fair and reasonable with regard to the particular defendant involved.

Examining the nature of defendant's conduct in this case we find that it was not a passive purchaser which blandly submitted to the mandates of a foreign seller. Rather, Cleveland conducted extensive and active negotiations with Proctor, and succeeded through the exercise of its own economic power in obtaining concessions in the form contract provided by Proctor. 'To the extent the buyer vigorously negotiates, perhaps dictates, contract terms . . . and otherwise departs from the passive buyer role it would seem that any unfairness which would normally be associated with the exercise of long-arm jurisdiction over [it] disappears.' In-Flight Devices Corp. v. Van Dusen Air, Inc., *supra*, 466 F.2d at 233. Moreover, although Cleveland conducts an essentially localized operation it remains a commercial enterprise which continually moves in a modern business world. As such it should reasonably have anticipated that a failure to make the installment payments on its obligations would have consequences in this state and could result in its being called to defend itself in the state whose laws governed the contract. Additionally, nowhere in the record does it appear that it would be physically or financially impossible for Cleveland to defend itself in this state. Mere inconvenience to the defendant is not sufficient to deny plaintiff the forum of his choice. Weinberger v. Retail Credit Co., 345 F.Supp. 165 (E.D.Pa.1972); Philadelphia v. Emhart Corp., 317 F.Supp. 1320 (E.D.Pa.1970)."

So too in the instant case, we encounter no difficulty in finding that the Defendant purposefully availed itself of the privilege of acting within Pennsylvania, for it is noted the Plaintiff accepted the Defendant's terms by

a telegram sent from Pennsylvania. Since the Defendant in its telegram of June 4, 1973 authorized a telegram as a proper method of acceptance, the contract must be regarded as having been executed in Pennsylvania. Burton v. United States, 202 U.S. 344, 26 S.Ct. 688, 50 L.Ed. 1057 (1905); 1 Corbin on Contracts, § 81 (1963 ed). In addition, it is important to note that the contract was not the only relationship between the parties, for there were some seventy-five phone calls exchanged pursuant to the performance of the contract, numerous letters and telegrams exchanged between the parties, and the subject matter of all of this was Penn-, sylvania steel. Thus, when the Defendant was concerned with stevedoring and warehousing of the Pennsylvania product, it clearly availed itself of the privilege of invoking the benefits and protection of the law of the Commonwealth of Pennsylvania relating to that product.

The second criterion of *Proctor* relates to "the cause of action [arising] from the defendant's activities within the forum state" (228 Pa.Super. at 20, 323 A.2d at 15). As in *Proctor*, the entering into commercial obligations by the Defendant here, and the alleged breach of those obligations, provides the necessary jurisdictional relationship. Shipment to Clark grew out of the commercial relations with Follansbee of Pennsylvania and is, thus, directly related to Defendant's activities here. (42 Pa. S. § 8309(a)(1))

■ We then come to the question, "Will the exercise of jurisdiction in this particular case be fair and reasonable under the circumstances?" *Id.* at 20, 323 A.2d at 16. There can be no question that Clark's activities gave rise to substantial commercial activity within this State and, thus, there was a quantitative economic impact, as found by the Court in *Proctor*. But here, also, it was not simply "a passive purchaser which blandly submitted to the mandates of a foreign seller". *Id.* at 21, 323 A.2d

at 16. There were extensive negotiations conducted by Clark involving Pennsylvania steel, and to hold that the Defendant in this case could reasonably anticipate the possibility of being called to defend an action in Pennsylvania, certainly does not offend any sense of fair play and equal justice. We, therefore, conclude that the application of the "Long-Arm" Statute in this case can be constitutionally sustained, and Defendant's Motion to Quash Service will be denied.

## II.   MOTION TO TRANSFER.

■■ We next come to Defendant's Motion to Transfer Under 28 U.S.C. § 1404(a), "for the convenience of parties and witnesses, and in the interest of justice". It is noted briefly that, under this Statute, Plaintiff's choice of forum is entitled to respect, and the burden is on the moving party to establish that a balancing of proper interests weighs in favor of transfer. Shutte v. Armco Steel Corporation, 431 F.2d 22, 25 (3d Cir. 1970), cert. denied 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971). What we must really determine is whether the Plaintiff's choice of forum creates problems of convenience for the Defendant and its witnesses of such a substantial nature that transfer is appropriate in the interests of justice, notwithstanding the Plaintiff's choice of forum. Transfer must meliorate such problems while not shifting the problem of inconvenience to the Plaintiff. Clay v. Overseas Carriers Corp., 61 F.R.D. 325 (E.D.Pa.1973); Mitchell v. Farrell Lines, Inc., 350 F.Supp. 1325, 1327 (E.D.Pa.1972).

In the instant case, this Court has not been furnished with the names of witnesses to be called or the substance of their testimony or a showing of the materiality of such alleged evidence, nor any other matters which could assist the Court in making a rational determination before transferring the action, thereby depriving the Plaintiff of its choice of forum. Bogosian v. Gulf Oil

582

Corporation, 337 F.Supp. 1230, 1233 (E.D.Pa.1972); Bonnell v. Baker, 331 F.Supp. 1373, 1374 (E.D.Pa.1971); *see generally* Chicago, Rock Island & Pac. R. Co. v. Hugh Breeding, Inc., 232 F.2d 584, 588 (10th Cir. 1956); General Portland Cement Co. v. Perry, 204 F.2d 316, 319–320 (7th Cir. 1953). Our District has many cases to the same effect. Legg v. Pittsburgh & Lake Erie Co., 186 F.Supp. 73 (W.D.Pa.1960); Padgett v. Atlantic Greyhound Corp., 126 F.Supp. 124 (W.D.Pa.1954); and Sherman v. Baltimore & O. R. Co., 122 F. Supp. 492, 493 (W.D.Pa.1954).

■ In the case *sub judicio*, the Defendant merely states that there are forty-five longshoremen in New Hampshire who participated in the loading of this shipment of steel, and that these men are not permanent Clark employees. In addition to the fact that there is no indication as to how many of these men would testify, or any hint as to the nature of their testimony, it is obvious that since these men are not Clark employees, they would not be vital to the Defendant's business in New Hampshire and, thus, there is a failure to provide the details of inconvenience.

What we have said above applies primarily to the Motion to Transfer to the District of New Hampshire. With respect to transfer to the District of Massachusetts, the same reasoning would be applicable and, in addition, the burden is on the moving party to show that in the first instance the action might be brought in the District in which it is sought to be transferred. Schutte v. Armco Steel Corporation, *supra*. The Defendant here has failed to establish on the record any fact which would prove either that it is doing business in Massachusetts under the Federal Venue Statute, 28 U.S.C. § 1391, or transacting business in Massachusetts under the Massachusetts "Long-Arm" Statute, M. G.L.A. Chapter 223A § 3. At best, Defendant implies that fifteen employees of Clark (of Boston) work in Boston, and perform supervisory functions both in Boston and Portsmouth. However, there is no indication that any of these employees performed such services as would make Clark (of New Hampshire) suable in Massachusetts.

In summary, the Defendant has not presented any facts sufficient to demonstrate that this Court, pursuant to 28 U.S.C. § 1404(a), should transfer venue for the convenience of the parties and witnesses, in the interest of justice. For the foregoing reasons, we conclude that the Court may exercise in personam jurisdiction over the Defendant foreign corporation and that venue is proper in the Western District of Pennsylvania. The Defendant's Motion to Transfer must, therefore, be denied.

An appropriate Order will be entered.